## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| **GEORGIA REPUBLICAN PARTY, INC., a state political party committee, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, GEORGIANS FOR KELLY LOEFFLER, BETHANY BALLARD, ASHLEY GILLES, and JEAN M. SEAVER,** | Case No.  _____ |
| **Plaintiffs,** | |
| v. | **DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |
| **BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia and Chair of the State Election Board, REBBECCA SULLIVAN, in her official capacity as Vice Chair of the State Election Board, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as Members of the State Election Board, PATRICIA GIBSON, PATRICIA FEATHERSTONE, KEITH RUSTIN, TOMMY CLARK, and SANDRA DEAN, in their official capacities as Members of the Glynn County Board of Elections, THOMAS MAHONEY III, MARIANNE HEIMES, MALINDA HODGE, ANTWAN LANG, and DEBBIE RAUERS, in their official capacities as Members of the Chatham County Board of Elections,** | |
| **Defendants.** | |

## **COMPLAINT**

Plaintiffs Georgia Republican Party, Inc., Perdue for Senate, Georgians for Kelly Loeffler, Bethany Ballard, Ashley Gilles, and Jean M. Seaver, by and through undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Defendants Brad Raffensperger, in his official capacity as the Secretary of State of Georgia and Chair of the State Election Board;

Rebecca N. Sullivan, in her official capacity as the Vice Chair of the State Election Board; David J. Worley, Matthew Mashburn, and Anh Le, in their official capacities as Members of the State Election Board; Patricia Gibson, Patricia Featherstone, Keith Rustin, Tommy Clark, and Sandra Dean, in their official capacities as Members of the Glynn County Board of Elections; Thomas Mahoney III, Marianne Heimes, Malinda Hodge, Antwan Lang, and Debbie Rauers, in their official capacities as Members of the Chatham County Board of Elections (collectively, "Defendants"). Plaintiffs respectfully seek declaratory and injunctive relief on an expedited basis in order to protect their voting and associational rights in the 2021 run-off election for Georgia's U.S. Senators.

## INTRODUCTION

1. This case seeks to vindicate the constitutional and statutory rights of Georgia electors, candidates, and political parties who face imminent harm from Defendants' tabulation and certification of double votes that are unlawful under the Voting Rights Act.

2. On November 3, 2020, Georgia held a general election and special election for its seats in the United States Senate—currently held by Senators David A. Perdue and Kelly L. Loeffler. The elections failed to yield a majority vote for either office. Accordingly, per state law, Georgia will now hold a run-off election on January 5, 2021.

3. The 2021 run-off election has garnered significant national attention because it will determine control of the United States Senate in the 117th Congress.

4. In the month-long registration period following the November general election, Georgia has registered more than 32,000 new voters—many of them new to the state.

5.     Plaintiffs were able to independently verify that **hundreds** of these voters have already cast ballots in states in which a U.S. Senate seat was on the ballot during the 2020 general election.

6.     However, the Voting Rights Act prohibits individuals such as these from double voting, *i.e.*, voting more than once for U.S. Senator.  *See* 52 U.S.C. § 10307(e).

7.     Because Defendants—Georgia's election officials—have instituted **no** safeguards to prevent these voters from casting unlawful votes, they are poised to tabulate and certify a significant number of double votes in violation of both the Voting Rights Act and the U.S. Constitution.

8.     The resulting harm to Plaintiffs' voting and associational rights will soon become irreparable.  In-person early voting began on December 14.  But, more importantly, absentee ballots are already being completed, and Defendants will begin processing absentee ballots on December 21, 2020.  *See* SEB Rule 183-1-14-0.9-.15(1); Sec'y State, *2020 State Elections and Voter                                    Registration                                    Calendar* https://sos.ga.gov/admin/files/2020%20Revised%20Short%20Calendar.pdf.

9.     At that point—*i.e.*, when individuals vote in-person or when the mail-in ballots are separated from their envelopes for processing—any attempt to identify and discount double votes will be futile, as ballot secrecy requirements mean that the unlawful votes will be mixed with legitimate votes and impossible to identify.  Thus, even if the state identifies double voters, their unlawful votes cannot be undone.  As a result, Plaintiffs' voting and associational rights will be irreparably harmed.

10.    This Court must act immediately to protect Plaintiffs' voting and associational rights.  Specifically, to prevent double-voting and to ensure that a remedy remains viable after

election day, Plaintiffs respectfully request that the Court (i) declare that counting and certifying these unlawful ballots violates Georgia law, the Voting Rights Act, and the U.S. Constitution, (ii) enjoin and/or restrain Defendants from counting and certifying these illegal votes, and (iii) order Defendants to segregate the ballots submitted by new-resident voters until their validity can be determined in accordance with law.

## PARTIES

11.    Plaintiff Georgia Republican Party, Inc. ("the State Party") is a state committee, as defined by 52 U.S.C. § 30101(15), a Georgia Political Party as defined by O.C.G.A. § 21-2-2(25), a domestic non-profit corporation, and the official Republican Party organization of the state of Georgia.  The State Party represents a diverse group of members and stakeholders across Georgia, including elected officials, candidates for elected office, state committee members, advisory caucuses, affiliate groups, and active voters.  These members and constituents, including many eligible voters, regularly support and vote for candidates affiliated with the Republican Party, including candidates seeking election to the United States Senate.  The State Party's members vote in federal elections and aid and urge others in voting. *See* Declaration of Stewart Bragg, a true and correct copy of which is attached as **Exhibit A**.

12.    Plaintiff National Republican Senatorial Committee ("NRSC") is a Republican political committee that is established and maintained as a national political party, as defined in 11 C.F.R. § 110.2(c)(2)(iii) and 52 U.S.C. § 30116(h). The NRSC is a national organization solely devoted to strengthening the Republican Senate Majority and electing Republicans to the United States Senate. The NRSC accomplishes this mission by supporting and assisting current and prospective Republican U.S. Senate candidates throughout the country, including in Georgia, in the areas of budget planning, election law compliance, fundraising, communications tools and

messaging, and research and strategy. In 2020, the NRSC made substantial contributions and expenditures to support the two Republican Senate candidates in Georgia in the November 3, 2020 general election, it has already made substantial contributions and expenditures to support these candidates in the January 5, 2021 run-off, and it intends to make further expenditures in connection with the run-off election. The NRSC frequently represents the interests of Republican Senator candidates, including Senators, David A. Perdue and Kelly L. Loeffler as candidates for the Georgia run-off election. Senators David A. Perdue and Kelly L. Loeffler are members of the NRSC. *See* Declaration of Darby Grant, a true and correct copy of which is attached as **Exhibit B.**

13.     Plaintiff Perdue for Senate is the principal campaign committee supporting David A. Perdue's campaign for the United States Senate, within the meaning of 52 U.S.C. § 30102(e). *See* Declaration of Benjamin Fry, a true and correct copy of which is attached as **Exhibit C.**

14.     Plaintiff Georgians for Loeffler is the principal campaign committee supporting Kelly L. Loeffler's campaign for the United States Senate, within the meaning of 52 U.S.C. § 30102(e). *See* Declaration of Benjamin Grayson, a true and correct copy of which is attached as **Exhibit D**.

15.     Plaintiff Voter Bethany Ballard is a resident of Houston County, Georgia.  Ms. Ballard voted in the 2020 November election and plans to vote in the 2021 run-off election for Georgia's U.S. Senate seats. *See* Declaration of Bethany Ballard, a true and correct copy of which is attached as **Exhibit E**.

16.     Plaintiff Voter Ashley Gilles is a resident of Lamar County, Georgia.  Ms. Gilles voted in the 2020 November election and plans to vote in the 2021 run-off election for Georgia's U.S. Senate seats.  *See* Declaration of Ashley Gilles, a true and correct copy of which is attached as **Exhibit F**.

17.     Plaintiff Jean M. Seaver is a resident of Chatham County, Georgia.  Ms. Seaver voted in the 2020 November election and plans to vote in the 2021 run-off election for Georgia's U.S. Senate seats.  *See* Declaration of Jean M. Seaver, a true and correct copy of which is attached as **Exhibit G**.

18.     Defendant Brad Raffensperger is the Secretary of State of Georgia ("the Secretary").  Under Georgia law, the Secretary is "the state's chief election official."  O.C.G.A. § 21-2-50(b); *see also id.* § 21-2-210.  The Secretary has the authority and responsibility to manage Georgia's electoral system.  *See Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (explaining that the office of Secretary of State "imbues [the Secretary] with the responsibility to enforce the [election] law or laws at issue in the suit").

19.     Under Georgia law, the Secretary is also the Chairman of the State Election Board ("the Board"), which has "the duty" "[t]o promulgate rules and regulations so as to obtain uniformity in the practices of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections."  O.C.G.A. § 21-2-31(1).  The Board also has the duty to ensure the "fair, legal, and orderly conduct of primaries and elections."  *Id.* § 21-2-31(2), (10).

20.     Defendant Rebecca N. Sullivan is the Vice Chair of the State Election Board, and Defendants David J. Worley, Matthew Mashburn, and Anh Le are Members of the State Election Board.  These Defendants—acting together with the Secretary—carry out the duties of the State Election Board as laid out in Georgia law.  *See, e.g.*, O.C.G.A. § 21-2-31.

21.     The Secretary and the State Election Board have the authority to direct each county's officials who are responsible for administering elections in Georgia.  *See* O.C.G.A. § 21-2-31(1).  The State Election Board promulgates rules or emergency rules that provide uniform

guidance to county officials regarding the conduct of elections. *See id.*; *see also id.* § 50-13-4 (describing the rulemaking process); *Rules and Rulemaking of the State Election Board*, State Election Board (Last visited Dec. 17, 2020) (listing all the rules and emergency rules promulgated by the State Election Board), https://sos.ga.gov/index.php/elections/state_election_board. The Secretary has, from time to time, also issued Official Election Bulletins to Georgia's counties.

22.    The Secretary has previously used this rulemaking authority to promulgate regulations designed to ensure the accuracy of voter registration information. *See, e.g.*, Ga Comp. R. & Regs. 590-8-1-.02.

23.    Defendants Patricia Gibson, Patricia Featherstone, Keith Rustin, Tommy Clark, and Sandra Dean are members of the Glynn County Board of Elections.

24.    Defendants Thomas Mahoney III, Marianne Heimes, Malinda Hodge, Antwan Lang, and Debbie Rauers are members of the Chatham County Board of Elections. (Defendants, Glynn and Chatham County Boards of Elections hereinafter referred to collectively as "County Election Board Members").

25.    Under Georgia law, the County Election Board Members are responsible for administering the run-off election in Glynn County and Chatham County, subject to the direction of the State Election Board. *See* O.C.G.A. § 21-2-70. This includes responsibility for "instruct[ing] poll officer and others in their duties" and computing and certifying election returns. *See id.* § 21-2-70(7), (8), (9).

26.    All Defendants are sued for declaratory and injunctive relief in their official capacity.

## JURISDICTION AND VENUE

27.     This Court has subject-matter jurisdiction over this action because it arises under the laws and Constitution of the United States.  28 U.S.C. § 1331.  Specifically, this action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 to enforce and to enjoin violations of the First and Fourteenth Amendments to the U.S. Constitution, and of the Voting Rights Act.  The Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a)(4), because this action seeks "to secure equitable or other relief under [an] Act of Congress providing for the protection of civil rights, including the right to vote."

28.     Venue is proper in this District because all Defendants reside in Georgia, the County Election Board Members reside in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims will occur within this judicial District.  *See* 28 U.S.C. § 1391(b)(1), (2).

29.     Venue is proper in this Division because a substantial part of the events giving rise to Plaintiff's claims will occur within Glynn County.  L.R. 2.1(c).  Specifically, Defendants' actions will permit tabulation of unlawful votes in Glynn County, among others in this Division.

30.     In addition, Defendants have registered 176 new voters in Glynn County, according to information provided by the Secretary of State on December 9, 2020. At least 8 already voted in their previous states' general elections for those states' U.S. Senate seats. *See* Declaration of Mark Morgan ¶ 24, a true and correct copy of which is attached as **Exhibit H**.

31.     Plaintiffs Ballard, Gilles, and Seaver (collectively, "Plaintiff Voters") each have Article III standing because they have voted in the 2020 November election in Georgia and intend to vote in the 2021 run-off election for Georgia's U.S. Senate seats. *See* Ballard Decl. ¶¶ 6, 8; Gilles Decl. ¶¶ 6, 8; Seaver Decl. ¶¶ 6, 8.

32.     Plaintiff Voters will be imminently injured by the state's failure to adequately prevent unlawful double voting in the run-off election by the debasement and dilution of their right to vote in contravention of the Voting Rights Act and the Constitution.  Congress included anti-fraud provisions in the Voting Rights Act with the express purpose of protecting individuals' right to vote.  And it is well settled that vote dilution is a concrete and particularized injury.  *See, e.g.*, *Liu v. United States Cong.*, No. 19-3054, 2020 WL 6306971, at *3 (2d Cir. Oct. 28, 2020) ("Because the Supreme Court's cases have consistently held vote dilution to be an injury in fact, we conclude that [a plaintiff alleging vote dilution] plausibly alleged the first element of standing.").

33.     Plaintiffs, the State Party, NRSC, Perdue for Senate, and Georgians for Loeffler (collectively, "Political Organizations") have suffered—and continue to suffer—an ongoing injury because Defendants' failure to take measures to prevent unlawful double votes from being cast by new registrants has caused the Political Organizations to divert their own resources toward trying to prevent the violation of their members' voting rights. *See* Bragg Decl. ¶ 14; Grant Decl. ¶ 16; Fry Decl. ¶ 13; Grayson Decl. ¶ 13.

34.     Specifically, Plaintiff Political Organizations have committed significant resources toward ensuring that the tens of thousands of new registrants are eligible to vote in the run-off. This commitment of resources is ongoing. *See* Bragg Decl. ¶¶ 9-11; Grant Decl. ¶¶ 10-13; Fry Decl. ¶¶ 8-10; Grayson Decl. ¶¶ 8-10.

35.     Plaintiff Political Organizations would not have to put resources toward these efforts if Defendants segregated the ballots of new registrants, thereby ensuring the State would have ample opportunity to screen their validity under state law.

36.     If the Plaintiff Political Organizations did not have to divert these resources, it would put them toward their electoral advocacy for Senators David A. Perdue and Kelly L. Loeffler in this crucial and highly competitive run-off election.

37.     In addition, Plaintiff Political Organizations have standing because the Political Organizations' members unquestionably would have standing to sue in their own right. Plaintiff Political Organizations may vindicate their members' interests (including the election of Republican candidates, the implementation of fair and equal election procedures in the 2021 run-off election, and the prevention of vote dilution for the two Republican Senate candidates) because they are crucial to the Political Organizations' purpose.

38.     Two of the Political Organizations' candidate-members, Senators David A. Perdue and Kelly L. Loeffler, ran for election to the U.S. Senate in the 2020 general and special elections and will be on the ballot in the 2021 run-off election for Georgia's U.S. Senate seats.

39.     These and other of Plaintiff Political Organizations' members voted in the 2020 November election and intend to vote in the 2021 run-off election for Georgia's U.S. Senate seats.

40.     Plaintiff Political Organizations' candidate-members will also suffer a "personal, distinct injury" to their First and Fourteenth Amendment rights if these unlawful votes are counted. *Wood v. Raffensperger*, 20-14418, 2020 WL 7094866, at *4 (11th Cir. Dec. 5, 2020).

41.     Plaintiffs' injuries are caused by Defendants' acts and omissions that permit—and will lead to counting and certification of—illegal double votes.

42.     Plaintiffs' injuries will be redressed if the Court grants the relief requested.

## **FACTUAL ALLEGATIONS**

43.     Georgia's November 2020 election featured a general and a special election to fill each of its two U.S. Senate seats.

44.     No candidate for either of Georgia's Senate seats received a majority of the votes cast.  *See November 3, 2020 General Election*, Georgia Sec'y of State Brad Raffensperger (last updated           Nov.            20,            2020,            3:37            PM), https://results.enr.clarityelections.com/GA/105369/web.264614/#/summary.

45.     Accordingly, Georgia law requires the election to proceed to a run-off.  *See* O.C.G.A. § 21-2-501(a)(1); GA Const. art. II, § 2, ¶ 2.

46.     The run-off election for Georgia's Senate seats is scheduled for January 5, 2021. *See* O.C.G.A. § 21-2-501(a)(3).

47.     As of the filing of this lawsuit, the projected make-up of the United States Senate in the 117th Congress is 50 Republicans and 48 Democrats.

48.     Therefore, the results of the Georgia run-off will determine which party controls the Senate.  *See* Siobhan Huges & Cameron McWhirter, *Senate Control Hinges on Four Uncalled Election Results With Republicans Holding Edge*, Wall St. J. (Nov. 4, 2020), https://www.wsj.com/articles/senate-election-2020-results-11-04-2020-11604511606?mod=searchresults_pos13&page=5.

49.     Not surprisingly, Georgia's run-off election has garnered intense media attention, political campaign activity, and activism from both sides of the contest.

50.     Within days of the November elections, activists began urging non-Georgia residents to move to Georgia to vote in the 2021 run-off election.

51.     For example, Eric Levitz, a journalist for the New Yorker, posted on Twitter: "These run-offs will decide which party controls the Senate . . . .  If you have the means and fervor to make a temporary move to GA, [I] believe anyone who registers by Dec 7 can vote in these elections.  #BleedingGeorgia."

52.   On November 9, 2020, syndicated columnist and author Thomas Friedman appeared on CNN's Prime Time with Chris Cuomo and said, "I hope everybody moves to Georgia . . . in the next month or two, registers to vote, and votes for these two Democratic Senators . . . ."

53.   Many out-of-staters heeded this call to action, and tens of thousands of new voter registrations have been submitted since November 3.

54.   Hundreds of those individuals have been identified as having already voted in 2020 in states in which a race for U.S. Senate was on the ballot.

55.   Specifically, a list of new voter registrations between November 4, 2020 (the day following the 2020 general election) and December 7, 2020 (the last day to register in Georgia to vote in the 2021 run-off election) provided by the Georgia Secretary of State on December 8, 2020 ("Georgia List 1") shows that over 32,000 people registered to vote in Georgia in that brief time period. *See* Morgan Decl. ¶ 11.

56.   That list is incomplete. Indeed, the Secretary of State provided an updated list of new registrants on December 15, 2020 identifying over 49,000 individuals who registered to vote after the general election.  And many Georgia counties have not yet provided to the Georgia Secretary of State a final list of all individuals who registered to vote in Georgia since the 2020 general election.  Thus, there are likely thousands more new registrants. *Id.* ¶¶ 12, 25.

57.   For purposes of this Complaint, there was only time to analyze Georgia List 1. At least 978 of the individuals identified on the new registrant list previously voted in the 2020 general election in another state.  At least 425 of these individuals voted in a state where a U.S. Senate race was held. *See id.* ¶¶ 13-22, 25.

58.   There are likely hundreds of more such individuals. Plaintiffs still have not analyzed the approximately 17,000 new registrants identified by the Secretary of State on

December 15, 2020, and new registrants continue to be identified. *See id.* ¶ 25. Moreover, only a few states have certified or released their voting lists from November 3, meaning it is likely that hundreds more new Georgia registrants already voted for a candidate for U.S. Senator of another state in the 2020 general election.

59.     It is illegal for an individual to vote in the Georgia run-off if he or she already voted in 2020 for U.S. Senator in a different state.

60.     The Voting Rights Act imposes criminal sanctions for "vot[ing] more than once in an election referred to in [52 U.S.C. § 10307(e)(2)]." 52 U.S.C. § 10307(e)(1). "The prohibition . . . applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for . . . Member of the United States Senate . . . ." *Id.* § 10307(e)(2).

61.     This provision was passed specifically to prevent individuals from voting in multiple states during a federal election so as to protect voters from being "injured" by "another person's vote" being "counted more than once." H. Rep. No. 94-196, at 109 (1975). And it is part of section 11 of the Voting Rights Act, a set of "antifraud provisions" designed to ensure that each voter "will be afforded an opportunity to vote without personal fear, knowing that his ballot will be ***fairly counted and tabulated, and not nullified by illegally cast ballots[.]***" H. Rep. No. 89-439, at 50 (1965).

62.     In Georgia, a run-off election is a continuation of the general election or the special election. *See* Ga. Const. art. II, § 2 ("A run-off election shall be a continuation of the general election and only persons who were entitled to vote in the general election shall be entitled to vote therein."); O.C.G.A. § 21-2-501(a)(10) ("The . . . runoff election or special election runoff shall be a continuation of the . . . election[] or special election for the particular office concerned.").

63.     Accordingly, voting in Georgia's run-off election for U.S. Senator after voting for a candidate for U.S. Senator in another state in the 2020 general election constitutes "vot[ing] more than once in an election."

64.     These federal statutory prohibitions on double voting echo and enforce principles embedded in the U.S. Constitution.  "The conception of political equality . . . can only mean one thing—one person, one vote."  *Reynolds v. Sims*, 377 U.S. 533, 558 (1964) (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)).  Giving some individuals two votes, while giving others only one vote, is repugnant to equal protection and due process of the law.

65.     Despite the imminent threat of unlawful double voting, Defendants have failed to institute ***any process whatsoever*** to ensure that the tens of thousands of individuals registered to vote in the run-off election have not already voted for a candidate for U.S. Senator of another state in the 2020 general election.

66.     While Georgia has a *de jure* prohibition on double voting, O.C.G.A. § 21-2-572, there is no enforcement mechanism to prevent unlawful double votes from tainting the election.

67.     For example, local boards of registrars may remove unqualified electors from the registration list, *id.* § 21-2-228, but this measure does nothing to curb double voting.  It is not necessarily unlawful for a voter to ***register*** to vote in Georgia after voting for a candidate for U.S. Senator of another state in the 2020 general election.  Rather, the violation is ***voting*** in the Georgia Senate run-off after having already voted for a candidate for U.S. Senator of another state in the 2020 general election.

68.     Likewise, verifying voters' identification, registration status, and signatures will do nothing to detect or prevent double voting by new registrants.  The voter may well have obtained a valid ID, registered to vote, and cast a ballot with a valid signature.  This information, however,

does not shed any light on whether the voter has already cast a ballot for a candidate for U.S. Senator of another state in the 2020 general election.

69.     Despite the obvious inadequacy of existing election integrity measures, Defendants have taken no steps to prevent the casting of unlawful double votes.

70.     Nor have they ordered the segregation of all ballots cast by voters registering to vote between November 4, 2020 and December 7, 2020.  Without such segregation, and in the event that the number of ballots cast by new registrants is enough to control the outcome of the 2021 run-off election, it will be impossible to investigate the lawfulness of these votes and to protect Plaintiffs' voting and associational rights.

71.     Defendants intend to count and certify these unlawful double votes.

72.     Failure to prevent the imminent casting of these unlawful ballots threatens harm to Plaintiffs' voting rights as defined and protected by the Voting Rights Act.  *See, e.g.*, H. Rep. No. 94-196, at 109 (explaining that double-voting prohibition added because voters are "injured" by double-voting); H. Rep. No. 89-439, at 50 (explaining that 1965 voter fraud provisions added to protect right to vote from being "nullified by illegally cast ballots").

73.     Failure to prevent this imminent action by new registrants will also dilute Plaintiffs' lawfully cast ballots with unlawful ballots.  *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright . . . nor diluted by ballot-box stuffing[.]" (citations omitted)).

74.     This harm cannot be avoided with *ex ante* processing and review of newly-registered voters.  With the registration period having just closed, thousands of new registrants to investigate, and no procedures on the books to detect double voting by those who have just moved to the state, it is impossible to determine the legality of these new registrations as in-person early

voting already began on December 14, 2020, and absentee ballots will begin to be processed on December 21, 2020.

75.      Nor—without this Court's intervention—can this harm be resolved through *ex post* review of ballots.  After ballots are cast, the unlawful ballots will be mixed in with the lawful ballots, making it impossible to cure the injury to Plaintiffs.

76.      Only prompt relief from this Court can prevent Defendants from allowing double voters to unlawfully and irreparably injure Plaintiffs' voting rights.

77.      As such, this Court should order that all ballots cast by individuals registering to vote between November 4, 2020 and December 7, 2020 be segregated.  The Court should further order that—in the event that the votes could be material to the outcome of the election— Defendants investigate the new registrants to determine that they did not already vote for a candidate for U.S. Senator of a different state in the 2020 general election.

78.      This requested relief will both guarantee the integrity of the electoral process and ensure that Georgia residents who lawfully registered after November 3—and did not vote for a candidate for U.S. Senator of a different state in the 2020 general election—will have their votes counted.

79.      Plaintiffs do ***not*** request that this Court preclude ***any*** voter from casting a ballot.

**FIRST CLAIM FOR RELIEF**
**(Voting Rights Act – FAILURE TO EFFECTIVELY COUNT AND REPORT VOTES DUE TO VOTE DILUTION)**
(On Behalf of All Plaintiffs)

80.      Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

81.      Section 11(a) of the Voting Rights Acts provides:  "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision

of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote."  52 U.S.C. § 10307(a).

82.     "Vote" is a defined term that includes "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election."  *Id.* § 10310(c).

83.     A "vote" is not properly "count[ed]" or "included in the appropriate totals"—in violation of section 11(a) of the Voting Rights Act—where it is diluted by the counting of unlawful ballots.  *See Gray v. Main*, 309 F. Supp. 207, 212–13 (M.D. Ala. 1968).

84.     Section 11(e) of the Voting Rights Act provides that it is unlawful to "vote[] more than once" in "any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for . . . Member of the United States Senate."  52 U.S.C. § 10307(e)(1), (2).

85.     In exercising its authority to protect the right to vote, Congress determined that voters "may be injured if another person's vote is counted more than once."  H. Rep. No. 94-106, at 109 (1975).

86.     The double voting provision is part of the suite of antifraud provisions in section 11 of the Voting Rights Act aimed at deterring "practices of fraud and corruption in attempts to nullify the impact on election results of the reinfranchised voters[.]"  H. Rep. No. 89-439, at 50; *see also id.* (recognizing that successful exercise of the franchise requires voters "not only be

guaranteed an equal opportunity to register and vote" but also not have their votes "nullified by illegally cast ballots").

87.     Congress's legislative decisions to define and remedy civil rights violations are entitled to deference.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (May 24, 2016) ("[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important.  Thus, we said in *Lujan* that Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992)) (alterations omitted)).

88.     Even if it were not entitled to deference, Congress is undoubtedly correct that "the right of suffrage can be denied by the debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *see also Liu v. United States Cong.*, No. 19-3054, 2020 WL 6306971, at *3 (2d Cir. Oct. 28, 2020).

89.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her rights secured by the Constitution and law is also liable at law and in equity.

90.     Private litigants may sue to enforce the Voting Rights Act through section 1983. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294–97 (11th Cir. 2003); *Gray v. Main*, 291 F. Supp. 998, 999 (M.D. Ala. 1966) (finding that Voting Rights Act plaintiffs could sue state for "tabulation of illegally cast ballots" because "42 U.S.C. § 1983 seems clearly to permit individuals such as plaintiffs to bring an action alleging violations of § 1973i" (which was transferred to 52 U.S.C. § 10307)).

91.     Courts have consistently held that individual voters may sue in federal court to enforce the Voting Rights Act's protections.  *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2020 WL 6305325, at *13 (S.D.N.Y. Oct. 28, 2020) (collecting cases allowing for enforcement of section 11 of the Voting Rights Act); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 554–57 & nn.15, 21 (1969) (allowing private parties to enforce section 5 of the Voting Rights Act); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 230–35 (1996) (applying same logic to sections 2 and 10 of the Voting Rights Act).

92.     Plaintiff Voters intend to vote in Georgia's 2021 run-off election.  *See* Ballard Decl. ¶ 8; Gilles Decl. ¶ 8; Seaver Decl. ¶ 8.

93.     Plaintiff Political Organizations' candidate-members are on the ballot in Georgia's 2021 run-off election and each intends to vote in the election.

94.     Defendants have registered tens of thousands of new voters since November 3, 2020.  Hundreds of those voters already voted for a candidate for U.S. Senator of a different state in the 2020 general election. *See* Morgan Decl. ¶ 13.

95.     Glynn County has registered at least 176 new voters between November 3, 2020 and December 7, 2020, according to information provided by the Secretary of State on December 8, 2020.  At least 8 already voted in their previous states' general elections for those states' U.S. Senate seats. *See id.* ¶ 24.

96.     Chatham County has registered at least 999 new voters between November 3, 2020 and December 7, 2020, according to information provided by the Secretary of State on December 8, 2020.  At least 19 already voted in their previous states' general elections for those states' U.S. Senate seats.  *See id.* ¶ 23.

97.     Ballots cast by these registrants--that have already voted for a candidate for U.S. Senator of a different state–in Georgia's 2021 run-off election will be unlawful.

98.     Defendants' counting and certification of these unlawful ballots will imminently deprive Plaintiffs of their rights secured by the Voting Rights Act.

### SECOND CLAIM FOR RELIEF
**(Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – VIOLATION OF EQUAL PROTECTION)**
(On Behalf of All Plaintiffs)

99.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

100.    Under the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.

101.    "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—*one person, one vote*."  *Reynolds*, 377 U.S. at 558 (emphasis added) (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)).

102.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

103.    Plaintiff Voters intend to vote in Georgia's 2021 run-off election. *See* Ballard Decl. ¶ 8; Gilles Decl. ¶ 8; Seaver Decl. ¶ 8.

104.    Plaintiff Political Organizations' candidate-members are on the ballot in Georgia's 2021 run-off election, and each intends to vote in the election.

105.    Defendants have registered tens of thousands of new voters since November 3, 2020.  Hundreds of those voters already voted for U.S. Senator in a different state on November 3. *See* Morgan Decl. ¶ 13.

106.    Glynn County has registered at least 176 new voters between November 3, 2020 and December 7, 2020, according to information provided by the Secretary of State on December 8, 2020.  At least 8 already voted in their previous states' general elections for those states' U.S. Senate seats. *See id.* ¶ 24.

107.    Chatham County has registered at least 999 new voters between November 3, 2020 and December 7, 2020, according to information provided by the Secretary of State on December 8, 2020.  At least 19 already voted in their previous States' general elections for those States' U.S. Senate seats.  *See id.* ¶ 23.

108.    By voting in both their previous States' general elections and Georgia's 2021 run-off elections, these new-resident voters will be impermissibly voting twice in the same election, in violation of the "one person, one vote" principle.   *See, e.g.*, *United States v. Olinger*, 759 F.2d 1293, 1302 (7th Cir. 1985) (upholding a double voting conviction based on "a conspiracy to violate the equal protection clause of the fourteenth amendment by . . . willful participation in fraudulent and unconstitutional dilution of votes of the citizens").

109.    Accordingly, Defendants' counting and certification of these unlawful double-voting ballots will imminently deny Plaintiffs equal protection of the laws.

### THIRD CLAIM FOR RELIEF
**(First and Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – UNDUE BUDEN ON THE RIGHT TO VOTE)**
(On Behalf of All Plaintiffs)

110.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

111.    Under the *Anderson-Burdick* balancing test, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).   This test employs a flexible, sliding scale that analyzes "severe" burdens on First and Fourteenth Amendment rights under "strict scrutiny," and lesser burdens under less exacting scrutiny. *See New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020).

112.    In addition, "[t]he Fourteenth Amendment due process clause protects against 'the disenfranchisement of a state electorate.'" *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1403 (N.D. Ga. 2019) (quoting *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981)).   "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation." *Id.* (quoting *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1183–84 (11th Cir. 2008)).   The debasement or dilution of votes may constitute a due process violation "even if such conduct does not completely deny Plaintiffs the right to vote." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1322 (N.D. Ga. 2018).

113.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

114.    Plaintiff Voters intend to vote in Georgia's 2021 run-off election. *See* Ballard Decl. ¶ 8; Gilles Decl. ¶ 8; Seaver Decl. ¶ 8.

115.     Plaintiff Political Organizations' candidate-members are on the ballot in Georgia's 2021 run-off election, and each intends to vote in the election.

116.     Defendants have registered tens of thousands of new voters since November 3, 2020.  Hundreds of those voters already voted for U.S. Senator in a different state during the 2020 general election. *See* Morgan Decl. ¶ 13.

117.     Glynn County has registered at least 176 new voters between November 3, 2020 and December 7, 2020, according to information provided by the Secretary of State on December 8, 2020.  At least 8 already voted in their previous states' general elections for those states' U.S. Senate seats. *See id.* ¶ 24.

118.     Chatham County has registered at least 999 new voters between November 3, 2020 and December 7, 2020, according to information provided by the Secretary of State on December 8, 2020.  At least 19 already voted in their previous States' general elections for those States' U.S. Senate seats. *See id.* ¶ 23.

119.     By diluting lawful votes through counting unlawful double votes, Defendants will burden the associational and voting rights of Plaintiffs and their members.

120.     Defendants cannot justify the burdens on Plaintiffs' fundamental rights.

121.     These burdens also amount to fundamental unfairness.

122.     Accordingly, Defendants' counting and certification of unlawful ballots will imminently place an undue and fundamentally unfair burden on Plaintiffs' voting and associational rights to vote in violation of the First and Fourteenth Amendments.  *See Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 581 (11th Cir. 1995) (holding unconstitutional state's decision to count unlawful absentee ballots because doing so would have "effectively stuff[ed] the ballot box" thereby "dilut[ing] the votes of those voters who met the requirements of [the absentee voting

law] as well as those voters who actually went to the polls on election day." (citations and internal quotations omitted)).

### FOURTH CLAIM FOR RELIEF
**(Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – VIOLATION OF PROCEDURAL DUE PROCESS)**
(On Behalf of All Plaintiffs)

123.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

124.    The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

125.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

126.    The right to vote is a liberty interest.

127.    The right to association is a liberty interest.

128.    Defendants' tabulation and certification of unlawful double votes will debase Plaintiffs' fundamental rights without due process.

129.    Georgia's election laws make it impossible to remedy the tabulation and certification of double votes after the ballots have been cast.

130.    Defendants would remedy this issue by requiring county precincts to segregate the ballots of newly-registered voters, giving the State ample opportunity to ensure that these ballots are not unlawful double votes in the event that they are material to the outcome of the run-off election.

131.    The state would face only a marginal administrative burden in implementing this policy.

132.    To date, Defendants have not implemented such a ballot segregation policy.

133.    Defendants' procedurally deficient process will result in the counting of unlawful ballots and thus imminent harm to Plaintiffs and its members' voting and associational rights.

134.    The Fourteenth Amendment Due Process Clause requires segregation of these likely-unlawful ballots to mitigate the high risk of erroneous deprivation. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor and against Defendants, as follows:

A.  Declare that it is unlawful for individuals who already voted for a candidate for U.S. Senator in the 2020 general election in a different state to vote for a candidate for U.S. Senator again in the Georgia run-off election;

B.  Preliminarily and permanently enjoin Defendants to segregate all ballots cast by voters registering to vote between November 4, 2020 and December 7, 2020;

C.  If it is determined that such votes are material to the outcome of one or both of the run-offs, enjoin Defendants to investigate whether such voters already voted for U.S. Senator in another state in the 2020 general election;

D.  Award Plaintiffs their allowable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or any other basis in law, as appropriate; and

E.  Grant such further and additional relief as this Court deems just and proper.

December 17, 2020

Respectfully submitted,

*/s/ Jeffrey S. York*
Jeffrey S. York
Georgia Bar Number: 781116
SHUTTS & BOWEN LLP
1022 Park Street, Suite 308
Jacksonville, FL 32204
Telephone: (904) 899-9952
Facsimile: (904) 899-9965
jyork@shutts.com
jheard@shutts.com

George N. Meros, Jr.*
Benjamin J. Gibson*
SHUTTS & BOWEN LLP
215 South Monroe Street
Suite 804
Tallahassee, FL 32301
Telephone: (850) 241-1717
Facsimile: (850) 241-1716
gmeros@shutts.com
bgibson@shutts.com
mabramitis@shutts.com

Leah J. Zammit**
Georgia Bar Number: 784244
SHUTTS & BOWEN LLP
4301 W. Boy Scout Blvd.
Suite 300
Tampa, Florida 33607
Telephone: (813) 229-8900
Facsimile: (813) 227-8258
lzammit@shutts.com
ldeleary@shutts.com

*Counsel for Plaintiffs*

*\*Pro Hac Vice Application Forthcoming*
*\*\*Admission Pending*