**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| **GEORGIA REPUBLICAN PARTY, INC., et al.** | |
| **Plaintiffs,** | Case No.  2:20-cv-00135-LGW-BWC |
| v. | |
| **BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, et al.,** | **DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |
| **Defendants.** | |

**PLAINTIFFS' EMERGENCY MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND A PRELIMINARY**
**INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for a temporary restraining order and preliminary injunction ordering the Defendants to segregate the ballots of individuals who registered to vote in Georgia since the November 3 general election until such time that Defendants can further investigate whether those voters previously voted for U.S. Senator in another state during the 2020 general election. This motion is supported by the incorporated memorandum of law that follows and the exhibits attached to Plaintiffs' Complaint filed prior to the filing of this motion.  Pursuant to S.D. Ga. LR 7.7, and for good cause shown herein, Plaintiffs request that the Court implement an expedited procedure for the immediate consideration and disposition of this motion, including, but not limited to, the setting of an expedited scheduling conference, waiving the time requirement set forth in Rule 7.7, and the granting of an immediate hearing on this motion to decide the extremely time-sensitive relief requested herein.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

STANDARD OF REVIEW ........................................................................................ 4

ARGUMENT ............................................................................................................. 4

     I.     Plaintiffs Will Succeed On The Merits Of Their Claims.......................... 4

          A.     Plaintiffs Have Standing. ............................................................. 4

          B.     Defendants Will Violate Plaintiffs' Voting Rights Guaranteed By The Voting Rights Act. ............................................................. 9

          C.     Defendants Will Deprive Plaintiffs Of Their Fourteenth Amendment Right To Equal Protection.................................... 15

          D.     Defendants Will Place An Undue Burden On Plaintiffs' Right To Vote................................................................................................ 16

          E.     Defendants Will Violate Plaintiffs' Procedural Due Process Rights......... 19

     II.     The Harm To Plaintiffs' RIGHT TO VOTE Is Irreperable. .................. 20

     III.     The Balance Of Equities Favors Plaintiffs............................................. 21

     IV.     The Public Interest Favors Plaintiffs...................................................... 21

CONCLUSION......................................................................................................... 21

## INTRODUCTION

This case seeks injunctive and declaratory relief to protect Plaintiffs' right to vote. Section 11(e) of the Voting Rights Act makes it unlawful for an individual to cast a ballot for U.S. Senator in two separate states during a single federal election.  In Georgia, however, this voting rights protection is an empty promise.  Georgia law has no procedure to determine whether newly-registered voters participating in the January 2021 run-off election have already cast a ballot for a candidate for U.S. Senator of another state in the 2020 general election.  As a result, Defendants are poised to tabulate and certify unlawful ballots in violation of Section 11(a) of the Voting Rights Act and of the United States Constitution.  Indeed, the available data shows this to be a certainty.  From November 4 to December 7—the registration period between the general election and the run-off—hundreds of people have registered to vote in Georgia that have already voted in another state where a U.S. Senate race was held.

Absent this Court's relief, Plaintiffs will suffer irreparable harm to their voting rights. There is simply no time for Defendants to verify that the more-than 49,000 new registrants did not previously vote for U.S. Senator in a different state during the 2020 general election before Georgia begins processing ballots.  In-person early voting began on ***December 14***, and absentee ballots will begin to be processed on ***December 21***.  And once the State starts processing these ballots, the votes of these new registrants—many of whom have already voted for a candidate for U.S. Senator—will be stripped of identifying information and mixed in with all other votes.  At this point, Defendants' voting rights violation will be complete and irreversible.

There is, however, a targeted and modest remedy that this Court can offer to ensure both that lawful votes of new registrants are counted and unlawful double votes are rejected. Specifically, Plaintiffs ask this Court to segregate the ballots of individuals who registered to vote since the November 3 general election until such time that Defendants can further

investigate whether those voters previously voted for U.S. Senator in another state during the 2020 general election.  Plaintiffs do not request that any voters—including new registrants—be precluded from casting a ballot.  Because in-person voting has already begun and absentee ballots will start being processed on Monday, December 21, Plaintiffs respectfully request immediate action.

## BACKGROUND

Last month, Georgia held a general election and a special election to fill its U.S. Senate seats.  Neither race resulted in a candidate winning a majority of the votes cast.  Accordingly, the election will now proceed to a run-off on January 5, 2021.  *See* Ga. Code Ann. § 21-2-501(a)(1), (3); Ga. Const. art. II, § 2, ¶ 2.  Because the Senate is currently projected at 50 Republicans and 48 Democrats—and because Democrats will control the Vice President's tie-breaking vote—the run-off election will feature two of the most high-stakes Senate races in recent memory.

Following the general election, Georgia opened registration to vote in the run-off through December 7, 2020.  *See* Georgia Secretary of State, 2020 State Elections and Voter Registration Calendar, at 1, https://sos.ga.gov/admin/files/2020%20Revised%20Short%20Calendar.pdf (last visited Dec. 17, 2020).[1]  As of December 8, 2020, the Secretary had reported that over 32,000 people had done so, and according to an update by the Secretary on December 15, 2020, the number had grown to at least 49,000. *See* Compl. Ex. H (Morgan Decl.) ¶¶ 11, 25. The counties continue to update their new registrant lists, suggesting that the actual number of new registrants is significantly higher.  Of the initial list of 32,000 new registrants, Plaintiffs have been able to

---

[1] For many years, Georgia limited participation in its run-off elections to only those who had participated in the initial election, consistent with state law.  *See* GA Const. art. II, § 2, ¶ 2; Ga Code Ann. § 21-2-501(a)(10).  However, in 2017 the State entered into a consent decree allowing registration up to 30 days before a run-off, after a federal court found that the prior practice was preempted by the National Voter Registration Act.  *See* Consent Decree (Dkt. 42), *Georgia State Conference NAACP v. Georgia*, No. 1:17-CV-1397-TCB, at 2–3 (Oct. 17, 2017).

independently verify that at least 425 already voted in a state that held an election to the U.S. Senate this cycle. *Id.* ¶ 13. However, Plaintiffs have not yet been able to conduct a similar analysis on the updated list of new registrants. *Id.* ¶ 25. And only a few states have certified or released their voting lists from November 3. Thus, it is likely that hundreds more new Georgia registrants already voted for another state's U.S. Senator. *Id.*

These new registrants are at risk of violating federal law. The Voting Rights Act ("VRA") prohibits "vot[ing] more than once" in "any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of . . . Member of the United States Senate." 52 U.S.C. § 10307(e)(1), (2). An individual who votes for Senator in multiple states "votes more than once in an election[.]" 52 U.S.C. § 10307(e)(1). Because Georgia's run-off election is a continuation of the general election, *see* Ga. Const. art. II, § 2; Ga. Code Ann. § 21-2-501(a)(10), individuals who have already voted for U.S. Senator in another state may not vote for Georgia's U.S. Senator in the run-off election.

However, Defendants—Georgia's election officials—have not instituted any screening procedure to ensure that the state's more than 49,000 newly-registered voters have not already voted for U.S. Senator in another state. To be sure, Georgia prohibits double voting, *see* Ga. Code Ann. § 21-2-572, and authorizes local boards of registrars to remove unqualified electors from the registration list, *see id.* § 21-2-228(a). But the remedy—"***remov[al]***" of electors from the registration list, *id.* § 21-2-228(e)—fails to address the situation at hand, where voters may in fact be qualified to vote in Georgia, just not in the run-off election.[2] Likewise poll workers will not be able to identify double voters when they cast their ballots by simply checking their

---

[2] Not to mention that the appeal procedures alone give voters ten days to challenge removal from the registration list, *id.* § 21-2-228(f), more time than the week-long period between the end of the registration period and the start of early voting.

identification and confirming that they are registered to vote.  *See id.* §§ 21-2-417; 418(a).
Accordingly, Defendants are poised to tabulate and certify numerous ballots that have been made
unlawful under the VRA—in contravention of both that statute and the United States
Constitution.

## STANDARD OF REVIEW

A movant is entitled to preliminary relief if it makes four showings:  "(1) it has a
substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the
injunction issues; (3) the threatened injury to the movant outweighs whatever damage the
proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be
adverse to the public interest."  *Otto v. City of Boca Raton, Fla.*, No. 19-10604, 2020 WL
6813994, at *2 (11th Cir. Nov. 20, 2020) (citations and internal quotations omitted); *see Winter
v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Because all four factors favor Plaintiffs,
they are entitled to preliminary relief.

## ARGUMENT

### I.    PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A.    Plaintiffs Have Standing.

Plaintiffs must allege three elements to satisfy Article III standing:  "(1) an injury in fact
that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be
redressed by a favorable decision."  *Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866,
at *4 (11th Cir. Dec. 5, 2020).  All of the Plaintiffs will suffer an imminent injury in fact due to
Defendants' tabulation and certification of unlawful ballots.  *See infra*.  Plaintiffs' injuries are
traceable to the Defendants:  Plaintiffs will be harmed by Defendants' tabulation and
certification of unlawful ballots cast by double voters.  And Plaintiffs' injuries will also be
redressed if this Court were to require the segregation of ballots cast by new registrants:  such

relief would ensure that the state has adequate opportunity to review the eligibility of these new voters.

       1.    <u>Voter Plaintiffs</u>

Defendants' tabulation and certification of unlawful ballots will imminently injure Plaintiffs Ballard, Gilles, and Seaver (collectively "Voter Plaintiffs") voting rights. A burden on the right to vote "is sufficient to confer standing," even if "the right to vote [i]s not wholly denied." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (citations and internal quotations omitted)). "The right to an honest (count) is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured[.]" *Anderson v. United States*, 417 U.S. 211, 226 (1974) (citation and internal quotations omitted). Accordingly, "vote dilution can be a basis for standing." *Wood*, No. 20-14418, 2020 WL 7094866, at *5; *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (explaining that "vote dilution" is a "concrete and personalized injur[y]"); *Anderson*, 417 U.S. at 226 ("The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial." (citation and internal quotations omitted)). Defendants will imminently burden Plaintiffs' voting rights by tabulating and certifying ballots that are unlawful under the VRA.

This injury is not a generalized grievance. "[T]he Supreme Court has made clear that 'a person's right to vote is individual and personal in nature,' so 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1246 (11th Cir. 2020) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)). Each individual Plaintiff will be imminently disadvantaged by Defendants tabulation and certification of unlawfully-cast ballots. As the Supreme Court explained in *Baker v. Carr*,

individual plaintiffs have standing to allege that their votes have been diluted—even where that injury is shared by many—because "[t]hey are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right possessed by every citizen to require that the government be administered according to law."  369 U.S. 186, 208 (1962) (citations and quotations omitted).

The Eleventh Circuit's recent decision in *Wood v. Raffensperger* does not control the standing inquiry before this Court.  In *Wood*, the Eleventh Circuit found that a plaintiff's vote dilution claim did not establish injury in fact because it was a "generalized grievance."  No. 20-14418, 2020 WL 7094866, at *5.  Here, however, Congress has elevated Plaintiffs' specific allegations to a concrete, individualized harm.  In particular, the VRA prohibits "person[s] acting under color of law" from "refus[ing] to tabulate, count, and report" the vote of "any person who is . . . qualified to vote."  52 U.S.C. § 10307(a).  The statute further prohibits double-voting—a prohibition that is designed to protect lawful voters.  *See* 52 U.S.C. § 10307(e)(1).

Indeed, these "antifraud provisions" in Section 11 of the VRA were added with the express purpose of preventing harms to an individual's right to vote.  *See, e.g.*, H. Rep. No. 94-196, at 109 (1975) (explaining that double-voting prohibition was enacted to protect voters from being "injured" by "another person's vote" being "counted more than once."); H. Rep. No. 89-439, at 50 (1965) (explaining that section 11 was added to protect right to vote from being "nullified by illegally cast ballots").  Congress also gave private parties the right to enforce these substantive protections.  *See infra*; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969) ("The achievement of the [Voting Rights] Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General.").

Congress's decision to protect the right to vote from this specific injury is dispositive to the standing analysis, unlike in *Wood*.  "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements . . . [i]t may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (cleaned up) (quoting *Lujan*, 504 U.S., at 578).  Thus, even if *Wood* was controlling here and vote dilution from wrongly-counted ballots does not normally constitute a particularized harm, Congress has the authority to "elevate" that harm to a legally cognizable voting rights injury.  *See United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) ("It is clear, however, that acts may violate [statutory voting rights protections] even though they deprive no one of his constitutional rights.").  That is exactly what has happened here.

Indeed, the Supreme Court has addressed this precise situation.  In *Federal Election Commission v. Akins*, plaintiffs demanded that the FEC require an organization to make certain election disclosures, alleging that they were harmed by the nondisclosure of election information. 524 U.S. 11, 13–14, 21 (1998).  Prior to *Akins*, the Court had dismissed a case alleging a nearly identical harm—that an individual could not "fulfill his obligations as a member of the electorate in voting for candidates seeking national office" without the disclosure of certain information mandated by the Constitution—because the injury was "a generalized grievance[.]" *United States v. Richardson*, 418 U.S. 166, 176 (1974).  Relying on this case, the FEC argued that the plaintiffs' "failure to obtain information" was a "generalized grievance" because it was "shared in substantially equal measure by all or a large class of citizens."  *Akins*, 524 U.S. at 23 (citations and quotations omitted).  The Court disagreed, explaining that "the informational injury at issue [in *Akins*], directly related to voting, the most basic of political rights, is sufficiently concrete and

specific such that *the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts*." *Id.* at 24–25 (emphasis added). Regarding its contrary holding in *Richardson*, the Court explained that the critical distinction was the existence of a *statutory*—rather than a constitutional—protection. *See id.* at 22. Here, as in *Akins*, Congress properly exercised its authority in authorizing the vindication of voting rights. Accordingly, Voter Plaintiffs have satisfied Article III standing.

### 2.    Political Organization Candidate Members

Plaintiffs Political Organization candidate members—Senator David Perdue and Senator Kelly Loeffler—and Plaintiffs Perdue for Senate and Georgians for Kelly Loeffler will suffer imminent injury to their constitutional rights if Defendants are able to tabulate and certify unlawful double votes. As the Eleventh Circuit recently explained, "a political candidate harmed by [a state election process]" suffers "a personal, distinct injury." *Wood*, No. 20-14418, 2020 WL 7094866, at \*4 (citing *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995)). Indeed, "[t]he Supreme Court long has recognized candidates' constitutional rights under the First and Fourteenth Amendments to associate for political ends and to participate equally in the electoral process." *Swanson v. Worley*, 490 F.3d 894, 902 (11th Cir. 2007) (citations omitted). The inclusion of unlawful ballots injures candidates' "interest in a fair competition between eligible candidates[.]" *Drake v. Obama*, 664 F.3d 774, 782–83 (9th Cir. 2011); *see also id.* ("This notion of 'competitive standing' has been recognized by several circuits." (collecting cases)).

### 3.    Political Organization Plaintiffs

Plaintiffs Republican Party of Georgia, NRSC, Perdue for Senate, and Georgians for Loeffler (collectively, "Political Organizations") are suffering an ongoing resource diversion injury from Defendants' imminent tabulation and certification of unlawful double votes. *See*

Compl. Ex. A (Bragg Decl.) ¶ 14; Compl. Ex. B (Grant Decl.) ¶ 16; Compl. Ex. C (Fry Decl.) ¶ 13; Compl. Ex. D (Grayson Decl.) ¶ 13.  Eleventh Circuit "precedent holds that 'an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) (quoting *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).  Here, Plaintiff Political Organizations have diverted—and continue to divert—significant resources toward trying to prevent new registrants from casting unlawful double votes because of Defendants' failure to comply with the Voting Rights Act and the Constitution.  If Plaintiff Political Organizations did not have to divert these resources, they would have used them for continued electoral advocacy in Georgia's run-off election. *See id.*

**B.   Defendants Will Violate Plaintiffs' Voting Rights Guaranteed By The Voting Rights Act.**

The VRA provides a suite of prophylactic measures designed to protect the right to vote. It also gives private parties the ability to enforce these measures in federal court.  Defendants' tabulation and certification of unlawful double votes violates section 11(a) of the VRA.  52 U.S.C. § 10307(a).

1.   <u>Plaintiffs Are Authorized To Vindicate The Voting Rights Act's Protections.</u>

Private parties can use section 1983 to enforce the VRA.  In *Schwier v. Cox*, the Eleventh Circuit held that Congress did not preclude enforcement of the VRA through section 1983, notwithstanding the Act's public enforcement mechanism.  340 F.3d 1284, 1294–96 (11th Cir. 2003).  Accordingly, the court found that section 1(a)(2)(B) of the VRA[3] was enforceable

---

[3] This provision is currently codified at 52 U.S.C. § 10101(a)(2)(B).  *See* Voting Rights Act of 1965, Office of the Law Revision Counsel, United States House of Representatives,

through section 1983 under the Supreme Court's *Gonzaga/Blessing* framework, which asks whether (i) the statute contains "explicit right- or duty-creating language," (ii) the statute "clearly provides rights which are specific and not amorphous," and (iii) "the language of the statute is mandatory rather than precatory[.]"   *See id.* at 1296–97 (internal quotations omitted) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

Consistent with *Schwier*, section 11 of the VRA is enforceable under section 1983.  The provision contains explicit right-creating language:  Section 11 refers to individuals who are "entitled to vote" or "otherwise qualified to vote[.]"  52 U.S.C. § 10307(a).  And Congress enacted the section 11 prohibitions with the express purpose of protecting the right to vote.  *See* H. Rep. No. 94-106, at 109 (1975); H. Rep. No. 89-439, at 50 (1965); *see also Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citations and internal quotations omitted)).  Thus, while the subject of the section 11 provisions is the infringing party, "the focus of the text is nonetheless the protection of each individual's right to vote."  *Schwier*, 340 F.3d at 1296.  And because the statute contains "specific" and "mandatory" provisions designed to protect this right, it satisfies the remaining prongs of the enforceability inquiry.  *See id.* at 1296–97.

Other courts considering section 1983 enforcement of section 11 of the VRA have concurred in this analysis.  A decision issued in this Circuit shortly after the enactment of the Voting Rights Act of 1965 found that plaintiffs could challenge Alabama's "failure to purge the registration lists of the names of white voters no longer qualified to vote" and its "tabulation of illegally cast ballots" because "42 U.S.C. § 1983 seems clearly to permit individuals such as

https://uscode.house.gov/editorialreclassification/t52/Quick_Chart_for_Voting_Rights_Act_196 5.pdf (last visited Dec. 17, 2020) ("*VRA Codification Chart*").

plaintiffs to bring an action alleging violations of [section 11 of the VRA]." *Gray v. Main*, 291 F. Supp. 998, 999 (M.D. Ala. 1966).[4]  Indeed, courts have consistently found that the provisions in section 11 are directly enforceable by private plaintiffs.  *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2020 WL 6305325, at *13 (S.D.N.Y. Oct. 28, 2020) (collecting cases); *accord Allen*, 393 U.S. at 554–57 (finding that Congress contemplated private enforcement of section 5 of the VRA); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 230–35 (1996) (applying same logic to sections 2 and 10 of the VRA).  Plaintiffs are thus authorized to vindicate the protections contained in section 11 of the VRA.

### 2.  Defendants Have Violated Plaintiffs' Voting Rights Protected By The Voting Rights Act.

Section 11 of the VRA provides: "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote."  52 U.S.C. § 10307(a).  The Act defines "vote" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election."  *Id.* § 10310(c).

Defendants' tabulation and certification of illegitimate ballots constitutes a willful failure to fully and properly count the votes of Plaintiffs—individuals qualified to vote—in violation of section 11(a).  While Defendants will technically add Plaintiffs' ballots to the final tally, the

---

[4] The *Gray* court refers to section 1973i of the Voting Rights Act.  Section 11 of the Voting Rights Act was initially codified as 42 U.S.C. § 1973i but was then moved to 52 U.S.C. § 10307. *See VRA Codification Chart*.

statute specifically requires the state to "count" Plaintiffs' "*votes*," a defined term that "includes all action *necessary to make a vote effective*, including . . . having such ballot counted and included in the *appropriate totals* of votes cast[.]" *Id.* § 10310(c). "Therefore the Act bars state officials from committing acts which would prevent the vote of a qualified person from being made effective or properly counted and included in the appropriate totals." *Gray v. Main*, 309 F. Supp. 207, 213 (M.D. Ala. 1968); *accord Gray v. Sanders*, 372 U.S. 368, 381 n.12 (1963) ("being counted only for the purpose of being discarded" is "worth nothing"). And "[a] vote is not properly counted when, through dilution, it is not afforded its full weight and a total is not 'appropriate' if it included ballots illegally cast in violation of the [Constitution and the substantive provisions of the VRA.]" *Gray*, 309 F. Supp. at 213. Accordingly, permitting individuals "to cast illegal absentee or regular ballots" that "dilut[e] the votes" of legitimate voters "abridge[s] plaintiffs' rights under [section 11 of the VRA]." *Id.* at 212–13.

This straightforward textual interpretation is buttressed by the fact that the VRA expressly precludes the casting of the ballots at issue here. The VRA prohibits "vot[ing] more than once in an election[.]" 52 U.S.C. § 10307(e)(1). This provision outlaws voting for a candidate for U.S. Senator in one state and then voting again for a candidate for U.S. Senator in Georgia's run-off election. Indeed, the Act expressly allows for "voting in two jurisdictions" in certain narrow circumstances, but never "for an election to the same candidacy or office." 52 U.S.C. § 10307(e)(3). The necessary implication of this carveout is that "voting in two jurisdictions" outside of this exception is prohibited; otherwise, the exception would be meaningless. *See In re Cumbess*, 960 F.3d 1325, 1335 (11th Cir. 2020) ("The surplusage canon obliges [the court], whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word superfluous, void, or insignificant." (citations,

quotations, and alterations omitted)); *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 710 (11th Cir. 2019) (explaining that under "the time-honored maxim of construction, *expressio unius est exclusio alterius*, the inclusion of specific things implies the exclusion of those not mentioned[.]" (citations and internal quotations omitted)). Confirming this plain reading, the House Report to the double-voting amendment to the VRA expressly notes that the prohibition is designed to cover this precise situation:

> At least six States have no law prohibiting registration in more than one voting location. Thus, a person residing in Nevada could validly register there and move to Arkansas where he could also validly register within 30 days without having to give up his Nevada registration. If such a person were to vote twice in a subsequent federal election no law would be violated because each registration was procured with true information. [¶] ***This amendment remedies this gap*** in federal law by prohibiting, in a new subsection 11(e), voting more than once in the same federal election.

H. Rep. No. 94-196, at 109 (1975) (emphasis added).

Finally, it is no answer to claim that Georgia's run-off election for U.S. Senator is not part of the nation's election for U.S. Senators. Georgia's run-off election is "a continuation of the general election." GA Const. art. II, § 2, ¶ 2; *see also* Ga Code Ann. § 21-2-501(a)(10). As the Eleventh Circuit explained, "[a]lthough the run-off takes place on a separate day," it "does not reschedule the earlier general election, nor does it negate that election's outcome." *See Pub. Citizen, Inc. v. Miller*, 992 F.2d 1548 (11th Cir. 1993) (per curiam). Rather, "***the election continue[s] into a run-off***." *Id.* (emphasis added).

Tabulating votes that are diluted by ballots decreed unlawful under section 11(e) can hardly be consistent with the "count[ing]" and inclusion in "appropriate totals" required by section 11(a). *See Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1261 (11th Cir. 2020) (confirming interpretation using the "broader statutory context and its unmistakable purpose"). Indeed, Congress enacted the provisions in section 11 to ensure that voters' "ballot[s] w[ould] be fairly counted and tabulated and not nullified by illegally cast ballots[.]" H. Rep. No. 89-439, at

13

50.   These additions were expressly designed to "deal[] with problems of voter fraud" in recognition that voters "may be injured if another person's vote is counted more than once."  H. Rep. No. 94-196, at 109.  A state may not evade these remedial provisions by turning a blind eye to unlawful votes in violation of section 11(a).  *See Nat'l Ass'n of the Deaf v. Fla.*, No. 18-12786, 2020 WL 6575040, at *6 (11th Cir. Nov. 10, 2020) (refusing to construe statute in a way that would "undermine the integrity of the statutory scheme.").

To be sure, VRA cases often involve claims of racial discrimination, but the lack of racially-motivated intent here does not absolve the violation.  The plain text of section 11(a) imposes no race-based intent requirement but instead broadly prohibits failing to tabulate the vote of "any person" who "is otherwise qualified to vote[.]"  52 U.S.C. § 10307(a).  Indeed, because many other contemporary provisions in the VRA *do* base their prohibitions in terms of racial distinctions, *see, e.g.*, 52 U.S.C. § 10101(a)(1) (providing that citizens are "entitled and allowed to vote . . . without distinction of race, color, or previous condition of servitude"), Congress's choice to not do so in section 11 is telling.  *See Ela v. Destefano*, 869 F.3d 1198, 1202 (11th Cir. 2017) ("It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Duncan v. Walker*, 533 U.S. 167, 173 (2001)).  Acknowledging this clear textual import, courts have rejected the argument that section 11 violations must be premised on race-based classifications.  *See, e.g.*, *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3–*4 (E.D. Va. Aug. 13, 2018) ("[I]n the absence of plain statutory text, statutory history, or binding case law to the contrary, the Court does not find that a showing of specific intent or racial animus is required

14

under § 11(b).”); *accord Schwier*, 340 F.3d at 1294–97 (allowing VRA claim under different race-neutral provision with no mention of race-based motivation).

In sum, Plaintiffs are likely to succeed on their VRA claim.

**C.    Defendants Will Deprive Plaintiffs Of Their Fourteenth Amendment Right To Equal Protection.**

Under the Equal Protection Clause of the Fourteenth Amendment, no State shall “deny to any person within its jurisdiction the equal protection of the laws.”  U.S. Const. Amend. XIV. “The conception of political equality from the Declaration of Independence, to Lincoln’s Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—***one person, one vote***.”  *Reynolds*, 377 U.S. at 558 (emphasis added) (quoting *Gray*, 372 U.S. at 381).

Georgia’s tabulation and certification of ballots cast by individuals who have already voted for U.S. Senator in another state violates the Equal Protection Clause.  By counting and certifying these votes, Georgia effectively gives these voters two votes for representation in the Senate and institutes a ***one person, two votes*** scheme that is repugnant to equal protection guarantees.  *See Reynolds*, 377 U.S. at 558.  If a voting system that merely dilutes the voting strength of one group of voters at the expense of another violates equal protection, *see Gray*, 372 U.S. at 368; *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969), then Georgia’s “one person, two votes” scheme must be unconstitutional.  *See, e.g.*, *United States v. Olinger*, 759 F.2d 1293, 1302 (7th Cir. 1985) (upholding a double voting conviction based on “a conspiracy to violate the equal protection clause of the fourteenth amendment by . . . willful participation in fraudulent and unconstitutional dilution of votes of the citizens”).  Plaintiffs are thus likely to succeed on their Equal Protection claim.

15

**D.     Defendants Will Place An Undue Burden On Plaintiffs' Right To Vote.**

Burdens on the right to vote are analyzed under the "*Anderson-Burdick* framework." *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020); *see Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).   Under this framework, "severe burden[s]" on the right to vote are permissible only if they are "narrowly tailored" and "advance[] a compelling interest."   *New Georgia Project*, 976 F.3d at 1280 (citations and internal quotations omitted).   "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."   *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) (citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)).   In addition, circumstances in which "the election process itself reaches the point of patent and fundamental unfairness" violate voters' substantive due process rights guaranteed by the Fourteenth Amendment.   *Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir. 1986).   Defendants run afoul of both standards.

1.     Defendants' Conduct Imposes a Severe Burden On The Right To Vote That Is Unjustified By Any Legitimate Interest.

Defendants' tabulation and certification of unlawful ballots imposes a burden on Plaintiffs' right to vote.   Every unlawful vote counted by the State directly counteracts Plaintiffs' legitimate votes.   *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright . . . nor diluted by ballot-box stuffing. . . . [T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (citations omitted)).   As the Eleventh Circuit has explained, allowing states to count unlawful ballots "would dilute the votes of those voters who m[e]et the requirements of" the law.   *Roe v. State of Ala. By & Through Evans*, 43

16

F.3d 574, 581 (11th Cir. 1995).  The counting and certification of these votes thus violates a fundamental element of Plaintiffs' franchise:  a voter's "right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."  *Anderson*, 417 U.S. at 227.

The burden here—dilution from hundreds of unlawful double votes—is substantial.  The Eleventh Circuit has held that a law that affected "less than 5 hundredths of a percent of . . . more than 9 million total ballots cast" imposed a "serious burden on the right to vote."  *Lee*, 915 F.3d at 1319–21; *accord Anderson*, 417 U.S. at 227 ("The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial." (citation and internal quotations omitted)).

Regardless of the ultimate weight given to this burden, Defendants cannot justify it under any standard of review because the state interests are minimal.  To be sure, the State has an interest in "***combatting*** voter fraud" and "***increasing*** confidence in elections," but it has no such interest in ***facilitating*** unlawful votes and ***undermining*** public confidence in elections.  *See Greater Birmingham Ministries v. Secretary of State for Alabama*, 966 F.3d 1202, 1230 (11th Cir. 2020).  Thus, the only valid interest the State may claim is the administrative ease of not segregating ballots cast by new registrants.

While the State "has an important interest in structing and regulating its elections to avoid chaos and to promote the smooth administration of its elections," *Lee*, 915 F.3d at 1322, that interest is not sufficient to justify the burden on Plaintiffs' voting rights.  The Eleventh Circuit has held that requiring a state to conduct notice-and-cure requirements for thousands of ballots rejected for signature mismatches would not "inordinately disrupt the smooth facilitation of [a

statewide] election." *Id.* at 1322.  Here, the relief requested is less burdensome than the notice-and-cure obligations in *Lee*.  Defendants must simply put ballots cast by new registrants in a separate pile than the other ballots.  In the event that the election margin is close enough that the new registrants' ballots will be material to the election result, the State will then be in a position to verify the legality of these ballots.  Thus, as in *Lee*, "the serious burden on voters outweighs [the State]'s identified interests[.]" *Id.* at 1326.  Plaintiffs are thus likely to succeed on their First and Fourteenth Amendment right-to-vote claim.

2.    Defendants' Conduct Reaches The Point Of Patent and Fundamental Unfairness.

"[E]lection laws that will effectively 'stuff the ballot box,' implicat[e] fundamental fairness issues." *Roe*, 43 F.3d at 581 (citing *United States v. Saylor*, 322 U.S. 385, 389 (1944)).  Accordingly, in *Roe v. State of Alabama By and Through Evans*, the Eleventh Circuit concluded that plaintiffs "demonstrated fundamental unfairness" by the State of Alabama after a state court required officials to count "absentee ballots that did not comply with [the state's election code]." *Id.* at 580–81.  The Court found that this "post-election departure from previous practice in Alabama" would, *inter alia*, "dilute the votes of those voters who met the requirements of the [absentee ballot rules] as well as those voters who actually went to the polls on election day." *Id.* at 581.

Here, as in *Roe*, Defendants' tabulation and certification of invalid double votes "implicate[s] fundamental fairness and the propriety of the . . . election[] at issue." *See id.* Indeed, as indicated by the close result in the general election, these illegal ballots may well amount to a "controlling number of votes" in the run-off election. *See id.* at 580. Defendants' inability to act in the face of concrete evidence of imminent double-voting that threatens to decide the outcome of the run-off is precisely the type of election process "that will effectively 'stuff the ballot box,'" *see id.* at 581 (citation omitted), and that "implicates the very integrity of

the electoral process." *Duncan*, 657 F.2d at 691.  Plaintiffs are likely to succeed on the merits of their substantive due process claim.

**E.    Defendants Will Violate Plaintiffs' Procedural Due Process Rights.**

The Fourteenth Amendment's Due Process Clause requires the State provide an individual with adequate process where it deprives that individual of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  To determine the process due, courts consider three factors: (1) the private interest at stake, (2) the risk of an erroneous deprivation of that interest under the current procedures and the probable value of additional procedure, and (3) the Government's interest.  *Id.* at 334–35.  Because voting is a protected liberty interest, plaintiffs may assert their procedural due process rights in challenging burdens on the right to vote.  *See Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270–73 (11th Cir. 2019) (Pryor, J. concurring in the denial of the motion for a stay).[5]

Here, these three factors militate in favor of the additional process requested by Plaintiffs. *First*, Plaintiffs have established that Defendants' actions will significantly undermine their "fundamental right to vote," "giving this first *Mathews* factor substantial weight."  *Id.* at 1271. *Second*, the risk of erroneous deprivation of Plaintiffs' voting rights is high because there are ***no*** procedures to prevent double voting from tainting the results of the run-off election.  Conversely, segregating ballots cast by new registrants will significantly decrease the risk that unlawful ballots are able to dilute the ballots of legitimate voters.  *Third*, the burden on the state—putting a relatively small number of ballots cast by new registrants in a separate pile—is minimal. Accordingly, Plaintiffs are likely to succeed on their procedural due process claim.

---

[5] *Contra New Georgia Project*, 976 F.3d, at 1282, 1287–89.

## II.     THE HARM TO PLAINTIFFS' RIGHT TO VOTE IS IRREPERABLE.

Absent an injunction from this Court, Plaintiffs will suffer irreparable injury to their rights to vote and associate.  "An injury is irreparable if it cannot be undone through monetary remedies."  *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (quoting *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010)) (internal quotations omitted).  Because "[n]o compensation a court can offer could undo" an injury to the right to vote, "[a] restriction on the fundamental right to vote constitutes irreparable injury."  *Id.* at 828–29 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)) (internal quotations omitted) (alterations omitted); *see also Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271–72 (11th Cir. 2020).  "Courts routinely deem restrictions on fundamental voting rights irreparable injury."  *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). Vote dilution—in violation of the VRA and the Constitution—irreparably harms voters' "right to an honest count . . . possessed by each voting elector" because legitimate voters' ballots are "distorted by fraudulently cast votes."  *See Anderson*, 417 U.S. at 226–27 (citations and internal quotations omitted).

The irreparable nature of the harm to Plaintiffs' voting rights is particularly pronounced in this case.  Absent this Court's intervention, new registrants' ballots will be stripped of identifying information and mixed in with all other ballots, despite substantial evidence that the former contain a high rate of unlawful double votes.  At that point, it will be too late for the State to sus out the valid ballots from the invalid.  Because "there can be no do-over and no redress," "[t]he injury to these voters is real and completely irreparable if nothing is done to enjoin this law."  *League of Women Voters of N. Carolina*, 769 F.3d at 247 (reversing district court).

### III.     THE BALANCE OF EQUITIES FAVORS PLAINTIFFS.

When courts balance a State's interests in administrative efficiency against the right to vote, the latter must carry the day.  *See Gonzalez*, 978 F.3d at 1272–73 (holding that the "right to vote" outweighed Georgia's asserted interest in "avoiding chaos and uncertainty in the State's election procedures").   Even "significant" justifications in which "the State has a weighty interest" "are unavailing as compared to the plaintiffs' interest in their opportunity to exercise the core democratic right of voting."  *Jones*, 950 F.3d, at 829.  Where, as here, the only interest to offset violation of Plaintiffs' voting and associational rights is "a state's administrative burden," "there is no contest[.]"   *See id.* at 830 (citing *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016)).

### IV.     THE PUBLIC INTEREST FAVORS PLAINTIFFS.

Finally, granting a preliminary injunction will benefit the public interest.  The public has a "strong interest in exercising the 'fundamental political right' to vote."  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  Indeed, the Eleventh Circuit has repeatedly found that "[t]he 'cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.'" *Jones*, 950 F.3d at 830 (quoting *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005)).  In addition, allowing ineligible voters to unlawfully dilute the ballots of legitimate voters and potentially alter the outcome of the election "would be harmful to the public's perception of the election's legitimacy[.]"   *See id.* (citations and internal quotations omitted).

### CONCLUSION

For all the foregoing reasons, the Court should grant the Motion for a Temporary Restraining Order and a Preliminary Injunction.   Because Plaintiffs' irreparable injury already manifested on ***December 14*** (when early in-person voting began) and increases exponentially on

**December 21** (when Defendants begin processing absentee ballots, *i.e.*, separating ballots from their envelopes)), Plaintiffs respectfully request that this Court issue immediate preliminary relief.

December 17, 2020                                     Respectfully submitted,

*/s/ Jeffrey S. York*
Jeffrey S. York
Georgia Bar Number: 781116
SHUTTS & BOWEN LLP
1022 Park Street, Suite 308
Jacksonville, FL 32204
Telephone: (904) 899-9952
Facsimile: (904) 899-9965
jyork@shutts.com
jheard@shutts.com

George N. Meros, Jr.*
Benjamin J. Gibson*
SHUTTS & BOWEN LLP
215 South Monroe Street
Suite 804
Tallahassee, FL 32301
Telephone: (850) 241-1717
Facsimile: (850) 241-1716
gmeros@shutts.com
bgibson@shutts.com
mabramitis@shutts.com

Leah J. Zammit**
Georgia Bar Number: 784244
SHUTTS & BOWEN LLP
4301 W. Boy Scout Blvd.
Suite 300
Tampa, Florida 33607
Telephone: (813) 229-8900
Facsimile: (813) 227-8258
lzammit@shutts.com
ldeleary@shutts.com

*Counsel for Plaintiffs*

*Pro Hac Vice Application Forthcoming
**Admission Pending

22

## CERTIFICATE REGARDING SERVICE

I HEREBY CERTIFY that a copy of the foregoing will be served upon each named

Defendant by process server along with the Complaint filed in this action.

*/s/ Jeffrey S. York*
Attorney
